**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| JOSHUA FIELDS, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:22-cv-74 (MTT)** |
| ) | |
| **BOARD OF TRUSTEES OF THE** ) | |
| **GEORGIA MILITARY COLLEGE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## ORDER

Defendant Board of Trustees of the Georgia Military College ("GMC") moves for summary judgment on plaintiff Joshua Fields' Americans with Disabilities Act ("ADA") and Rehabilitation Act claims.  Doc. 16.  For the following reasons, GMC's motion (Doc. 16) is **GRANTED in part and DENIED in part**.

## I. BACKGROUND[1]

GMC has eleven campuses, including Augusta and the Global Online Learning College ("GOLC"), a completely online campus.  Docs. 16-2 ¶ 4; 23-2 ¶ 4.  "GMC primarily offers two-year programs" and "most [of its] students are looking to transition into four-year degree programs offered elsewhere."  Docs. 16-2 ¶¶ 4-5; 23-2 ¶¶ 4-5.  It utilizes a "quarter system" rather than a semester system: Fall I, Fall II, Winter, Spring, and Summer.[2]  Docs. 16-2 ¶ 14; 23-2 ¶ 14.  Typically, GMC offers three types of

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] "For the academic calendar 2020-2021, Fall I began: August 3, 2020; Fall II began: October 6, 2020; Winter began: January 11, 2021; Spring began: March 17, 2021; Summer began: June 1, 2021."  Docs. 16-2 ¶ 15; 23-2 ¶ 15.

classes—completely online (GOLC), remote, and in-person.  Docs. 16-2 ¶ 10; 23-2 ¶ 10.  GMC allows teachers to transfer to GOLC for a quarter "if they are unable to meet their contractual hours of work for each quarter."  Docs. 16-2 ¶ 11; 23-2 ¶ 11.  However, before a teacher can transfer to GOLC, GOLC must approve that teacher and make sure there is an available class.  Docs. 16-2 ¶ 12; 23-2 ¶ 12.

**A. Fields' Employment with GMC**

In July 2013, GMC hired Fields to be an assistant professor of natural sciences on its Augusta campus.  Docs. 16-2 ¶ 1; 23-2 ¶ 1.  The Augusta campus, which provides primarily in-person classes, enrolls many pre-nursing students who attend "GMC to obtain enough credits in order to apply to, and attend nursing school."  Docs. 16-2 ¶¶ 7-8; 23-2 ¶¶ 7-8.  Thus, it is important to these students to have credits that will transfer.  Fields' classes all included a lab component and "were consistently full" with mostly pre-nursing students.  Docs. 16-2 ¶¶ 8-9, 22; 23-2 ¶¶ 8-9, 22.  For example, his microbiology course "would normally have 18 or 19 pre-nursing students out of 20 students in the classroom."  Docs. 16-2 ¶ 8; 23-2 ¶ 8.  And in 2020, "many nursing schools were not accepting credit for online lab courses."  Docs. 16-2 ¶ 9; 23-2 ¶ 9.

In the past, Fields taught GOLC science classes as an adjunct professor.  Docs. 23-3 ¶ 3; 27-1 ¶ 3.  That ended in 2016 when "the Director of the Augusta Campus, Shana Reid, decided that faculty at Augusta would no longer be allowed to teach for GOLC during the school year because she wanted the faculty contracted for Augusta to be using additional hours to assist students on the Augusta campus rather than students at other campuses."  Docs. 16-2 ¶ 17; 23-2 ¶ 17.

Fields' 2020 employment contract with GMC, dated June 5, 2020, provides that he was to be an assistant professor of biology on the Augusta campus from July 1, 2020 to June 30, 2021.  Docs. 16-2 ¶ 2; 23-2 ¶ 2; 23-3 ¶ 7; 27-1 ¶ 7.  Pursuant to his employment contract, Fields was required to teach "[a] full-time course load … of approximately 80 credit hours (the equivalent of four, five quarter hour courses per Fall I, Fall, Winter, and Spring terms) or 72 credit hours (the equivalent of three, six-hour lab science courses per Fall I, Fall, Winter and Spring terms)."  Docs. 16-2 ¶ 2; 23-2 ¶ 2 (alterations in original).  The contract further provided:

> By accepting this employment contract, you agree to the following obligations:
>
> A. To give your full-time efforts to the position and to participate in all activities incumbent to that position;
>
> B. …
>
> C. To teach for the Global Online College (GOLC) or perform other duties as assigned in the event you are unable to be assigned a full curricular workload (as outlined above) and you are not a GOLC faculty member;
>
> D. …
>
> E. To participate in student orientation and registration processes as scheduled during the year and to serve as a faculty mentor.

Docs. 16-2 ¶ 2; 23-2 ¶ 2 (alterations in original).

**B. GMC Augusta and the COVID-19 Pandemic**

Because of the COVID-19 pandemic, GMC announced on March 19, 2020 that "it was closing its campuses and temporarily moving all classes remote."  Docs. 16-2 ¶ 28; 23-2 ¶ 28.  In April 2020, GMC reaffirmed its plan to stay remote for summer 2020.  Docs. 16-2 ¶ 29; 23-2 ¶ 29.  GMC used Moodle for online classes in the beginning of the pandemic, a service its professors had used previously.  Docs. 16-2 ¶ 23; 23-2 ¶ 23.

On Moodle, Fields typically gave 45-minute lectures followed by instructions, lab discussions, and questions.  Docs. 16-2 ¶ 24; 23-2 ¶ 24.  Fields used a YouTube playlist for labs, which "showed each individual step of the lab, how it was done, the results, and related it back to the subject matter."  Docs. 16-2 ¶ 26; 23-2 ¶ 26.  Fields additionally "provided verbal instructions for students to complete some labs at home in their own time[] and directed students to free websites that provided online simulations of the labs."  Docs. 16-2 ¶ 26; 23-2 ¶ 26.

**C. GMC Augusta Transitions Back to In-Person Classes**

"On May 27, 2020, GMC informed all faculty and staff of its intention to reopen the campuses to in-person teaching, beginning Fall I (August), 2020."  Docs. 16-2 ¶ 30; 23-2 ¶ 30.  At a June 16, 2020 regional directors meeting, GMC's president stated: "'Faculty members will NOT teach at the GOLC solely because they are considered 'at risk' for the coronavirus.  We hired every faculty member to physically teach at their campuses for our in-seat students; that requirement still remains.'"  Docs. 16-2 ¶ 32; 23-2 ¶ 32.  On June 17, 2020, GMC Augusta's academic dean, Brian Hendricks, informed Fields that he had until July 3, 2020 to ask to transfer to GOLC for the Fall I quarter, but that his request would be subject to approval by GMC Augusta, GOLC, and Mike Holmes, GMC's then senior vice president, chief academic officer, and dean of faculty.  Docs. 16-2 ¶ 33; 16-5 at 16; 20 at 15:7-13; 23-2 ¶ 33.

Fields has "numerous chronic medical conditions including Crohn's Disease, kidney failure, and anemia."  Docs. 23-3 ¶ 12; 27-1 ¶ 12.  These conditions cause the following symptoms: "abdominal pain, diarrhea, loss of appetite, weight loss, malaise, anemia, metabolic disturbances (e.g., low potassium, low calcium, low magnesium),

extra-intestinal manifestations such as a fistula or a fissure, uveitis, joint inflammation, fatigue, and muscle cramps."  Docs. 23-3 ¶ 13; 27-1 ¶ 13.  His conditions, along with "the immune-suppressing treatments he receives for them[,] place him at higher risk for contracting COVID-19 and higher risk for an adverse outcome if he were to contract COVID-19."  Docs. 23-3 ¶ 16; 27-1 ¶ 16.  GMC was aware of Fields' Crohn's disease and renal failure and does not dispute that his medical conditions are disabilities.  Docs. 23-3 ¶¶ 11, 15; 27-1 ¶¶ 11, 15.  Indeed, prior to the COVID-19 pandemic, Fields "had previously exhausted his sick leave and FMLA" because of his conditions.  Docs. 16-2 ¶ 41; 23-2 ¶ 41.

Accordingly, Fields responded to Hendricks that "he would like to be considered" for a position at GOLC.  Docs. 16-2 ¶ 33; 23-2 ¶ 33.  On June 29, 2020, Hendricks informed Fields that transfers to GOLC would only be allowed for "low enrollment and not for COVID-19 concerns" and that Fields would need to request leave without pay "if he [did] not want to return to campus."  Docs. 16-2 ¶ 34; 23-2 ¶ 34.  Fields responded on July 3, 2020:

> Upon the advice of my physicians and in adherence to Governor Kemp's executive order (06.29.20.01), [sic] as an individual in the highest risk groups due to my diagnoses and disabilities, I must continue to shelter-in-place.  Given no other accommodation by GMC (unless my classes are being considered for cancellation due to low enrollment, therefore giving me the opportunity to teach through the GOLC this Fall) I will need to take leave for the Fall I quarter and, potentially additional quarters while the current conditions of the COVID-19 pandemic exist.  I would like to add that, should GMC return to remote learning, I will return to active status again to fulfill the course load requirements of my contract in any future quarter operated via remote learning.

Docs. 16-2 ¶ 35; 23-2 ¶ 35 (alteration in original).  Jill Robbins, GMC's Senior Vice President of Human Resources, responded that same day:

in regards to accommodating any staff or faculty who express the concern of being high risk and working on site; the amount of individuals who are able to produce justification and physician support in favor of remote work for immunocompromised employees has been too great.  Unfortunately, we have such a large quantity of requests, we have not been able to make the accommodation for remote work an accommodation because it will be a hardship for the institution to find so many working alternatives to backfill the campus-in-seat need.  While we would be able to fill classes online with full-time faculty, it would be a hardship for the in-seat classes to be filled with the amount of adjuncts we would need to find. … if the campus can continue to keep us informed about the quarters you will or will not return, can put you on leave status now, and then figure out how to prorate your contract when you do return.

Docs. 16-2 ¶ 36; 23-2 ¶ 36; 23-3 ¶ 18; 27-1 ¶ 18.[3]

On July 31, 2020, Fields told Hendricks, Robbins, Reid, and others:

In addition to being denied the opportunity to continue working through remote instruction (or temporary transfer to the GOLC), the director of the Augusta campus of GMC has informed me that I will not be permitted to seek additional forms of employment, in the form of teaching as an adjunct for the GMC GOLC, to earn an income while I am on leave … Lastly if GMC returns to distance learning at any point in the future, I ask to be immediately reinstated from LWOP back to active teaching status as soon as possible.

Docs. 16-2 ¶ 37; 21-3 at 2; 23-2 ¶ 37.

In sum, Fields requested GMC allow him to (1) teach remotely or (2) become a GOLC adjunct.  Docs. 16-2 ¶ 38; 23-2 ¶ 38.  GMC denied both requests, stating it "would not accommodate him transferring to an online … modality in order to fulfill his contractual obligations."[4]  Docs. 23-3 ¶¶ 25, 27; 27-1 ¶¶ 25, 27 (alterations in original). Fields never renewed his requests for accommodation.  Docs. 16-2 ¶ 38; 23-2 ¶ 38.

---

[3] Between September 2020 and May 2022, GMC allowed six full-time instructors to teach at GOLC based on an inability to fulfil their contractual hours.  Docs. 16-2 ¶ 40; 23-2 ¶ 40.  None of those instructors taught remotely.  Docs. 16-2 ¶ 40; 23-2 ¶ 40.

[4] GMC Augusta did not grant any request for accommodations related to teaching online.  Docs. 23-3 ¶ 24; 27-1 ¶ 24.  However, other campuses "allow[ed] natural science instructors to teach remote classes during the Fall I and Fall II terms."  Docs. 23-3 ¶ 28; 27-1 ¶ 28.

**D. Fields' Leave**

On August 10, 2020, Fields went on leave without pay.  Docs. 16-2 ¶ 41; 23-2 ¶ 41.  Because GMC was unable to find a replacement, Fields' Fall I 2020 classes were cancelled.  Docs. 16-2 ¶ 39; 23-2 ¶ 39.  From August 2020 through December 2020 (Fall I and Fall II 2020), GMC Augusta did not offer a remote option for science classes with labs.  Docs. 16-2 ¶ 10; 23-2 ¶ 10.

In September 2020, Fields "applied for short-term disability insurance."  Docs. 16-2 ¶ 42; 23-2 ¶ 42.  "In his application, his doctor noted, '[g]iven his precarious health, he should practice extreme social distancing and work from home anytime possible.  I advised him not to return to in-person teaching at this time.  Hopefully when the risk of Covid is greatly reduced, he can return to work in person.'"  Docs. 16-2 ¶ 42; 23-2 ¶ 42 (alteration in original).

On September 9, 2020, Fields responded to an email from his immediate supervisor, stating, "[u]nfortunately, I cannot give an accurate timeline for my return considering the fluid nature of the pandemic and the still considerable risks for someone in my position.  My physicians and legal counsel have asked me not to commit to a definite, planned return at this time."  Docs. 16-2 ¶ 43; 23-2 ¶ 43 (alteration in original).

On October 21, 2020, GMC's director of benefits, Tammie Pennington, spoke with Fields.  Docs. 16-2 ¶ 44; 23-2 ¶ 44.  She recalled that he said "he [was] not sure when he [would] be coming back" and that his doctors "have him out of work until COVID disappears, or a COVID immunization is developed."  Docs. 16-2 ¶ 44; 23-2 ¶ 44.

"On January 7, 2021, Pennington wrote to Robbins about [Fields], informing Robbins of receipt of [his] 'long term disability paperwork this week and as of 12/31/2020 he has missed 109 day[s].'"  Docs. 16-2 ¶ 47; 23-2 ¶ 47.

On January 31, 2021, GMC terminated Fields.  Docs. 16-2 ¶ 49; 23-2 ¶ 49.  At this time, GMC "was already preparing to terminate his employment 'because of exhaustion of FMLA and it being a hardship to keep his position open.'"  Docs. 23-3 ¶ 30; 27-1 ¶ 30.  Its stated reasons for his termination were that he "had stopped communicating," "his return date was uncertain," and GMC believed his application for long term disability meant he would not return.  Docs. 16-2 ¶ 49; 23-2 ¶ 49.

Based on GMC's denial of his requests for accommodation and his termination, Fields sued GMC for discrimination under the Rehab Act, Title I of the ADA, and Title II of the ADA.  Doc. 1 ¶¶ 26-35.  GMC moves for summary judgment on each claim.  Doc. 16.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id*.

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."  *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]"  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

GMC argues it is entitled to summary judgment because Fields' ADA claims are barred by Eleventh Amendment and sovereign immunity, and he cannot show that it failed to provide him with a reasonable accommodation or that he was terminated solely by reason of his disabilities.  Doc. 16-1.  Fields agrees GMC is immune from his Title I ADA claim for monetary damages, but argues it is not entitled to immunity or summary judgment on his other claims.  Doc. 23.

### A. GMC's Immunity[5]

Under Georgia law, the state is entitled to sovereign immunity.  Ga. Const. art. I, § 2, ¶ IX.  Similarly, "[t]he Eleventh Amendment protects a State from being sued in federal court without the State's consent."  *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).  Thus, only the state, or an arm of the state, can invoke sovereign and/or Eleventh Amendment immunity.  Fields acknowledges that he conceded GMC was entitled to invoke immunity in his response brief when he did not challenge GMC's immunity from his Title I ADA claim for monetary damages.  Docs. 23 at 9; 30 at 9 n.4.  Nevertheless, in supplemental briefing, he argues GMC is not an "arm of the state" under *Manders* and is not entitled to claim immunity.  Doc. 30 at 2-9.  The Court disagrees.[6]

---

[5] The terms "Eleventh Amendment immunity" and "sovereign immunity" are often used interchangeably, as the parties do here.  *See*, *e.g.*, Docs. 16-1 at 3; 30 at 14, 31 at 13.  However, the two are distinct doctrines.  *See Hufford v. Rodgers*, 912 F.2d 1338, 1340 (11th Cir. 1990) ("The question of Eleventh Amendment immunity apparently remains integrally confused with the related, but distinct, concept of state sovereign immunity.").  The Eleventh Amendment generally provides a nonconsenting state with immunity from suit brought by a private individual *in federal court*.  U.S. Const. Amend. XI; *Alden v. Maine*, 527 U.S. 706, 712-30 (1999).  Sovereign immunity, on the other hand, bars suit against a nonconsenting state, no matter the forum.  *See Hufford*, 912 F.2d at 1340-41.

[6] As Fields noted, GMC's initial briefing on immunity left something to be desired.  Doc. 23 at 10 n.4.  Consequently, the Court ordered supplemental briefing.  Doc. 28.  Fields seized what he saw as an

A *Manders* analysis is only necessary where, unlike here, it is not clear whether the defendant is a state actor. *See United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 601 (11th Cir. 2014); *Monroe v. Fort Valley State Univ.*, 574 F. Supp. 3d 1307, 1315-16 (M.D. Ga. 2021). Claims against Georgia sheriffs provide good examples of when a *Manders* analysis is necessary. That is because sheriffs, though state constitutional officers, perform mostly local functions and are primarily funded by the counties they serve. *See Monroe*, 574 F. Supp. 3d at 1315-16. But GMC is undeniably a state entity.

Even if the Court did a *Manders* analysis, as it did in *Gray v. Board of Trustees of Georgia Military College*, its conclusion would be the same. 2022 WL 683128, at *4-7 (M.D. Ga. Mar. 7, 2022). Georgia law defines GMC as a state entity; Georgia maintains a high degree of control over GMC; Georgia exercises significant control over GMC's budget; and Georgia is ultimately liable for any judgment entered against GMC. *Id.*; *Manders*, 338 F.3d at 1309; Docs. 31 at 4-7; 31-1; 31-2; 31-3.

In sum, GMC is entitled to raise sovereign and Eleventh Amendment immunity defenses, and Fields has shown nothing to change the Court's conclusion. Accordingly, the Court considers whether GMC is immune from Fields' ADA claims.

*1. Title I*

Again, Fields agrees that the Eleventh Amendment bars his Title I damages claims—"summary judgment in GMC's favor is appropriate and uncontested" as to that issue. Doc. 23 at 9; *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (holding that suits for damages under Title I of the ADA against state employers are

_____

opportunity to reverse course and argue that maybe GMC could not raise immunity after all. Doc. 30 at 2-9. Fields was right the first time.

barred by the Eleventh Amendment).  But Fields argues that he "may be entitled to injunctive relief under Title I of the ADA."  Doc. 23 at 10.  Regardless of whether that is correct, Fields does not request injunctive relief.  Docs. 1 at 13; 18 at 118:24-119:1 (Fields testified that he is not "seeking to get [his] job back through this lawsuit.").  Therefore, GMC is immune from Fields' Title I ADA claim.

*2. Title II*[7]

GMC is also immune from Fields' Title II claims.[8]

The United States Supreme Court held in *United States v. Georgia* that "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  546 U.S. 151, 159 (2006).  The Court established a three-part test to determine whether the state is entitled to sovereign immunity: (1) whether the state's alleged conduct violated Title II; (2) whether that conduct also violated the Fourteenth Amendment; and (3) "insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  *Id*.  Because, as

---

[7] This Court, like others, questions whether Congress intended Title II of the ADA to extend to employment discrimination claims.  *See, e.g.*, *Brumfield v. City of Chi.*, 735 F.3d 619, 622 (7th Cir. 2013); *Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303 (10th Cir. 2012); *Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169 (9th Cir. 1999); *Clifton v. Ga. Merit Sys.*, 478 F. Supp. 2d 1356, 1366 (N.D. Ga. 2007) ("However significant this court's concerns with allowing employment discrimination claims under Title II, though, it is bound by the prior precedent of this circuit.").  Indeed, the Supreme Court has held that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).  However, the Court is bound by *Bledsoe v. Palm Beach County Soil and Water Conservation District*, in which the Eleventh Circuit held that, although Title I of the ADA expressly covers employment-based disability discrimination, Title II of the ADA also states a cause of action for employment discrimination.  133 F.3d 816 (11th Cir. 1998).

[8] Because GMC is entitled to sovereign immunity, the Court will not address whether the Eleventh Amendment bars Title II claims against the state for employment discrimination.

explained more fully below, a jury could conclude that GMC failed to accommodate Fields' disability and terminated him because of his disability, part (1) of the test is satisfied.[9]  Thus, the Court must consider whether GMC's conduct also violated the Fourteenth Amendment, and if it did not, whether Congress validly abrogated sovereign immunity as to employment discrimination claims against the state.

Fields "does not assert a due process violation."  Doc. 30 at 12 n. 7.  Rather, he argues GMC's conduct violated his Equal Protection rights.  *Id*. at 12-14.  The Equal Protection Clause of the Fourteenth Amendment guarantees "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  "Where no fundamental right or suspect class is implicated, courts evaluate equal protection claims under the rational basis test."  *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017).  Because disabled persons are not a suspect class, a state's action against a disabled person need only be rational.  *Garrett*, 531 U.S. at 367; *Stanley v. City of Sanford, Fla*., 83 F.4th 1333, 1344 (11th Cir. 2023).

Under the rational basis test, a state's action "'cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'"  *Garrett*, 531 U.S. at 367 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).  "Moreover, the State need not articulate its reasoning at the moment a particular decision is made.  Rather, the burden is upon the challenging party to negative '"any reasonably conceivable state of facts that could provide a rational basis for the classification."'"  *Id*. (quoting *Heller*, 509 U.S. at 320).

---

[9] Although the Court's analysis below is under the Rehab Act, "[t]he standard for determining liability under the Rehabilitation Act is the same as that under the" ADA.  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

Thus, "[u]nder rational basis review, [courts] apply a strong presumption of validity, and narrowly inquire if the enacting government body *could* have been pursuing a legitimate government purpose." *United States v. Castillo*, 899 F.3d 1208, 1213 (11th Cir. 2018) (internal citations omitted).

The Supreme Court has held that the Equal Protection clause does not require an employer to provide reasonable accommodations to the disabled. *Garrett*, 531 U.S. at 367-68 ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause."). As to Fields' Title II claim based on his termination, Fields has not carried his burden "to negative "'any reasonably conceivable state of facts that could provide a rational basis for the classification.'"" *Id.* at 367 (quoting *Heller*, 509 U.S. at 320. Although Fields may not agree with GMC's stated reasons for his termination—a lack of communication, his inability to teach in person, exhaustion of FMLA, it being a hardship to keep his position open, and an indefinite return date—these reasons *could* be rationally related to GMC's interest in prioritizing the needs of its students. *Castillo*, 899 F.3d at 1213; Doc. 31 at 12. While GMC's actions may rise to the level of disability discrimination, as explained below, they do not violate the Equal Protection Clause. And because the Supreme Court has held that Congress did not validly abrogate the state's sovereign immunity as to disability discrimination in employment,[10] GMC is immune from Fields' Title II ADA claims. *Garrett*, 531 U.S. at 374.[11]

---

[10] Conversely, the Eleventh Circuit has held that Congress validly abrogated the state's sovereign immunity as to Title II claims brought by *students* against a state university. *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954 (11th Cir. 2005).

[11] The Court recognizes that *Garrett* was a Title I case and that the Supreme Court declined to state whether its holding extended to Title II. 531 U.S. at 360 n.1. However, "it would be illogical to find that history of state discrimination against the disabled in employment is insufficient to permit Congress to

Accordingly, GMC is entitled to summary judgment on Fields' ADA claims.

## B. Rehab Act Discrimination

The Rehab Act makes it unlawful to discriminate against an otherwise qualified individual based on his disability.  29 U.S.C. § 794(a).  Discrimination under the Rehab Act includes an employer's failure to provide reasonable accommodations and adverse employment action against an employee solely by reason of his disability.[12]  *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007); *Ellis*, 432 F.3d at 1326.  Fields contends GMC did both.

### 1. Failure to accommodate

To establish a prima facie case of discrimination under the Rehab Act for an employer's failure to accommodate, a plaintiff must show that (1) he is disabled, (2) he is qualified, and (3) his employer failed to provide him with a reasonable accommodation.  *Holly*, 492 F.3d at 1255-56.  GMC does not dispute that Fields was disabled or qualified.  Doc. 16-1 at 5.  Accordingly, the Court considers whether GMC failed to provide Fields with a reasonable accommodation.

---

enact Title I, but that that same history is somehow sufficient to allow Congress to fashion Title II." *Leverette v. Ala. Revenue Dep't*, 453 F. Supp. 2d 1340, 1345 (M.D. Ala. 2006); *see also Clifton*, 478 F. Supp. at 1368 ("The court finds that the Supreme Court's holding in *Garrett* … is equally applicable to employment discrimination claims under Title I and Title II of the ADA … [A] plaintiff should not be permitted to circumvent the holding of *Garrett* immunizing states from employment discrimination claims brought pursuant to Title I of the ADA by commencing suit under Title II, a subchapter which lacks any of the procedural protections afforded employers under Title I."); *Marx v. Ga. Dep't of Corrs.*, 2013 WL 5347395, at *3 n.3 (M.D. Ga. Sept. 23, 2013); *Lucas v. Ala. Dep't of Pub. Health*, 2016 WL 335547, at *4 (M.D. Ala. Jan. 7, 2016) ("This court is also persuaded that, if Congress exceeded its § 5 enforcement powers by its purported abrogation of sovereign immunity as to claims of employment discrimination against state employers under Title I, the same is true when those claims are brought under Title II."); *Culverhouse v. S. Union Cmty. Coll.*, 2021 WL 2417154, at *5 (M.D. Ala. June 14, 2021) ("[T]his Court is persuaded by the *Clifton* court's separation of the analysis governing (1) the ADA's textual applicability to employment discrimination claims against public entities and (2) whether, even if a claim is cognizable under Title II, it still may be barred by the Eleventh Amendment.").

[12] "[C]ases involving the ADA are precedent for those involving the Rehabilitation Act."  *Ellis*, 432 F.3d at 1326.

A reasonable accommodation is one which "presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003) (quoting *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1226 (11th Cir. 1997)).[13]  An employee bears the burden of identifying an accommodation that would allow him to perform the essential functions of his job. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).  And at the summary judgment stage, the employee must produce evidence that that accommodation was reasonable and available.  *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997).  Finally, because "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination," the "*McDonnell Douglas* burden-shifting [framework] is not applicable to reasonable accommodation cases."  *Holly*, 492 F.3d at 1262 (emphasis in original); *Nadler v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007).

Because his disabilities prevented him from teaching in person during the COVID-19 pandemic, Fields requested two accommodations: (1) to teach remotely, or (2) to transfer to GOLC.  Docs. 16-2 ¶ 38; 23-2 ¶ 38.

The Court agrees that teaching remotely at GMC Augusta was unreasonable. Fields' students were overwhelmingly pre-nursing students who planned to transfer to nursing school, and many nursing schools did not accept credits for online labs.  Docs. 16-2 ¶¶ 8-9; 23-2 ¶¶ 8-9.  Fields does not dispute this.  Instead, he says it would be difficult for nursing schools to determine whether a lab course was taught online.  Doc.

---

[13] The Eleventh Circuit questioned the precedential effect of this definition in *Beasley*.  69 F.4th at 756-760.  However, the concurrence in *Beasley* argued the definition as stated in *Lucas* was not dicta and is a governing rule.  *Id.* at 761-62 (Luck, J., concurring).  The point of the disagreement is not material here.

18 at 54:3-8, 145:20-146:17, 149:17-24.  If this is a serious argument, the Court cannot assume schools of higher education lack the ability to apply their admission criteria. Nor is it reasonable to suggest that GMC should "roll the dice" and hope that its students with untransferable credits will slip through—some would call that fraud.

However, the Court cannot, on these facts, conclude that Fields' request to transfer to GOLC was unreasonable.  GMC argues teaching at GOLC would not have "allow[ed] [Fields] to perform the essential functions of his job—to teach in-person classes and labs."  Doc. 16-1 at 8-9.  "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); 29 C.F.R. § 1630.2(n)(1).

Apart from teaching on the Augusta campus, there is a dispute as to whether teaching in-person was essential to Fields' employment as a teacher.  GMC states its students benefit from in-person instruction, but Fields testified that, in his experience, students benefited more from online labs.  Docs. 16-5 ¶¶ 2, 6; 18 at 81:1-82:21; 20 at 13:13-14, 33:4-9; 21 at 36:4-6.  Moreover, other GMC campuses allowed science professors to teach online, and Fields had done so previously.  Docs. 16-5 ¶ 4; 18 at 40:12-15.  Finally, as Fields points out, "*nothing* in [his employment] contract expressly references in-classroom instruction."  Docs. 18-1; 23 at 14; *Lucas*, 257 F.3d at 1258 (Where "'an employer has prepared a written description … for the job, this description shall be considered evidence of the essential functions of the job.'") (quoting *Earl*, 207 F.3d at 1365) (alterations in original).

GMC also argues that Fields' request to transfer to GOLC was unreasonable because *no* professors were allowed to transfer unless "they [were] unable to meet their

contractual hours of work for each quarter."  Doc. 16-1 at 16.  The Eleventh Circuit has rejected this type of argument:

> [T]he very purpose of reasonable accommodation laws is to *require* employers to treat disabled individuals differently in some circumstances—namely, when different treatment would allow a disabled individual to perform the essential functions of his position by accommodating his disability without posing an undue hardship on the employer.  Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement.

*Holly*, 492 F.3d at 1262.

GMC further argues that a transfer would have required it "to override the application process for GOLC" because (1) there was not an open position for Fields, (2) a transfer approval was outside of GMC Augusta's authority, and (3) Fields was not on the "pre-approved list" to transfer.  Doc. 16-1 at 16-17.  It is unclear how GMC Augusta lacked the authority to approve Fields' transfer to GOLC while, at the same time, possessed the authority to deny his request to transfer to GOLC.  Nor is it clear why GMC Augusta's position on a transfer to GOLC is relevant anyway—the question is whether GMC would accommodate Fields' disabilities at GOLC.

GMC's "pre-approved list" argument is just as suspect.  When GOLC's vice president of online education, Jeff Wells, provided the names on the pre-approved list, he made a clear point: "This is not to say faculty NOT on this list are ruled out.  It is just that they will need to be handled on a case-by-case basis and the vetting process will be a little more detailed and take longer."  Doc. 16-6 at 11.  GMC cites Wells' hearsay testimony that Randy Elvidge, the chair of the natural sciences department, "did not include Dr. Fields on the pre-approved list to teach the natural sciences because Elvidge did not think Fields was a good fit to teach for GOLC at that time."  Docs. 16-1

at 17; 16-6 ¶¶ 4, 15.  However, Reid testified that Elvidge (an agent of a party-opponent in this context) could not recall any performance issues by Fields.  Doc. 20 at 12:7-19. GMC provides no evidence from Elvidge himself.

Based on the above facts, the Court cannot conclude that a transfer to GOLC was an unreasonable accommodation.  *See* 42 U.S.C. § 12111(9)(B) (listing "reassignment to a vacant position" as a reasonable accommodation).  After all, online teaching is what teachers do at GOLC's completely online campus.  And GMC has failed to carry its "burden of persuasion of whether [that] accommodation would impose an undue hardship."  *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1526 (11th Cir. 1997).  "Once the plaintiff has made [his] showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances."  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). An undue hardship is "an action requiring significant difficulty or expense, when considered in light of" certain factors, including "the nature and cost of the accommodation," "the overall financial resources of the facility," "the number of persons employed at such facility," "the effect on expenses and resources," and "the impact otherwise of such accommodation upon the operation of the facility."  42 U.S.C. § 12111(10).

According to GMC, if Fields transferred to GOLC, GMC Augusta would have had to find someone to teach his classes, which it could not do.  Docs. 16-1 at 17; 27 at 8. Fields essentially argues that GMC never provided him with an opportunity to teach at GOLC and therefore did not know whether it would have had to cancel his classes; maybe his students would have enrolled in his GOLC classes.  Doc. 23 at 7, 16, 17.

Thus, as Fields notes, "[a]ny burden is a burden entirely of GMC's own making—at a minimum, a jury would be authorized to make such a finding." *Id*. at 16.  True, but as discussed, most of Fields' students needed transferrable credits; the chances that those students would follow Fields to GOLC seem slim.  Fields' better argument is that GMC Augusta had to replace Fields regardless of whether he transferred to GOLC.  The "hardship" of replacement was not a consequence of a GOLC accommodation; replacement was a consequence of Fields' inability to teach on campus.  The question is whether moving Fields to GOLC would be an undue hardship and, as discussed, it is far from clear why GMC could not accommodate Fields at GOLC, much less that a transfer would be an undue hardship.[14]

As the record stands, a reasonable jury could conclude that Fields' transfer to GOLC was a reasonable accommodation and would not have imposed an undue hardship, and GMC is not entitled to summary judgment on his Rehab Act failure to accommodate claim.

### 2. Adverse Employment Action

GMC argues it is entitled to summary judgment on Fields' adverse employment action claim because he cannot carry his burden under the *McDonnell Douglas* framework.  Doc. 16-1 at 5-7.  Fields does not respond to GMC's *McDonnell Douglas* argument.  Rather, he contends he can show discrimination under the convincing mosaic theory.  Doc. 23 at 11-12, 17-18.

---

[14] GMC also contends that Fields' request to transfer to GOLC "would have a negative impact on the Augusta campus, because … Augusta and GOLC have separate budgets" and GOLC had a lower retention rate than GMC Augusta.  Doc. 16-1 at 19.  If anything, the campuses' separate budgets illustrate that Fields' transfer to GOLC would free funds to hire his replacement.  And the relevancy of the retention rates is unclear.

After Fields informed GMC that his disabilities prevented him from working in person and GMC denied his accommodation requests, Fields went on medical leave beginning August 10, 2020.  Docs. 16-2 ¶¶ 35, 36, 41; 23-2 ¶¶ 35, 36, 41; 16-5 at 16. In September and October 2020, Fields confirmed with GMC that his return date was unknown due to the ongoing pandemic and his inability to teach in person.  Docs. 16-2 ¶¶ 43-44; 23-2 ¶¶ 43-44.

Fields was later approved for long-term disability and GMC received notice of that approval in early January 2021.  Docs. 16-2 ¶ 47; 18 at 114:8-11; 23-2 ¶ 47.  On January 7, 2021—before she became aware of Fields' long-term disability application—Robbins notified other leadership that GMC was "going to send [Fields] a letter that his contract has been terminated because of exhaustion of FMLA and it being a hardship to keep his position open."  Doc. 16-4 at 22.  Four days later, on January 11, 2021, GMC informed Fields he was terminated effective February 1, 2021:

> Georgia Military College is in receipt of your application for long Term Disability through The Standard
>
> …
>
> Due to your application for Long Term Disability, this letter is to inform you that Georgia Military College will await the decision for approval through The Standard for your benefit, and then the institution will terminate your contract/employment.

*Id*. at 23.  Hendricks then testified that sometime in November or December 2020, "GMC had to make budget cuts and eliminate faculty and staff positions to make these cuts work," and Fields' "position was one of those eliminated" because he "was no longer communicating with" GMC.  Doc. 16-5 ¶ 17.

In sum, GMC never informed Fields he needed to return, even though he repeatedly informed GMC that his return date was unknown. The actual reason for Fields' termination is not clear. As Robbins said, GMC may have terminated Fields because he exhausted his FMLA leave—a fact known to GMC prior to Fields' latest leave—and because it could not keep his position open. Or GMC may have terminated Fields based on its unilateral assumption that he did not want to work because his long-term disability had been approved. Or, as Hendricks says, Fields was terminated because of budget cuts and Fields' lack of communication. In short, the reasons for Fields' termination are as muddy as the reasons for GMC's failure to transfer him to GOLC.

Given the conflicting and in part confusing facts, it is clear that a reasonable jury could find that GMC fired Fields solely by reason of his disability. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[T]he plaintiff will always survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."); *Tynes v. Fla. Dep't of Juvenile Just.*, 88 F.4th 939, 946-947 (11th Cir. 2023) ("[T]he analysis turns on the substantive claims and evidence in the case, not the evidentiary framework."). Accordingly, GMC is not entitled to summary judgment on Fields' disability discrimination claim.

## IV. CONCLUSION

Although GMC is immune from Fields' ADA claims, a genuine dispute of material fact exists as to whether GMC failed to accommodate Fields' disability and whether

Fields was terminated solely by reason of his disability.  Accordingly, GMC's motion for summary judgment (Doc. 16) is **GRANTED in part and DENIED in part**.

     **SO ORDERED**, this 31st day of January, 2024.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT